May it please the Court, my name is Catherine Hart. Also present is Saylor Spetler, co-counsel for Michael Allen Hamilton, petitioner in this case. Your Honors, with permission of the Court, I would request that I be able to divide my argument with my co-counsel. We've previously submitted a request for both of us to argue. That's fine. You have 30 minutes for both of you. That's fine. And I would ask to reserve 5 minutes for the rebuttal at the end. All right. And I would like to begin with the ineffective assistance of counsel at the penalty phase. Your Honors, it is with great respect that I address this Court. It is a privilege and a responsibility, and of course, you're all aware that the highest calling, the highest responsibility in the judiciary is to decide a death for a person who has committed a crime. And so, I would like to begin by saying that I am a petitioner's counsel here. I've represented Michael Allen Hamilton for the last 12 years in the District Court and also at the California Supreme Court, the remand on the evidentiary hearing on juror misconduct. I want to start off with saying that the penalty phase in this case was only 3 1 . The penalty phase by any standard and certainly by 1982 standards was woefully insufficient. Now, the District Court, and we have to look, of course, at the District Court's findings, and this Court reviews this case to no vote, but looks at whether the District Court, whether there is clear error. I submit there is clear error in this case. First of all, one of the statements of the District Court was that the standard practice in death penalty cases in Tulare County in 1982 was different from today. The Court went on to say it was unclear what constituted a thorough background investigation. I will be the first to concede, having worked myself in death penalty cases since 1982, that the length, breadth, and scope of mitigation investigation is different now from what it was in 1982. However, by 1982, we had Eddings v. Georgia. We had Lockett v. Ohio. We had the 1980 ABA standards that called for a thorough investigation. One of the reasons that we cited as supplementary authorities today, we cited the case of Belmontes v. Ayers and the recent case that this Court, the Ninth Circuit, decided in June of 2008 was that that was a 1982 trial, and that was a trial from San Joaquin County. And that's just, you know, five counties up from Tulare County. And in that particular case, this Court --. Can I interject to ask a factual question related to this case rather than the standard, what was current in 1982? Yes, you may. I've read all the affidavits that we now have. I've read the psychiatric reports that we now have. The narrative, I mean, by any description, and I'm sure the State would agree, this was a horrible, horrible family life in which Mr. Hamilton was raised. How much of the information that we now have could have been obtained had he done an extensive investigation? Let me explain a little bit the purpose of my question. Mr. Leibowitz said, well, I couldn't talk to Carolyn. She was a defendant, and she was represented. I really couldn't get anything out of Vicki. The mother was uncooperative because, in part, I guess, she didn't want to talk about her own role in the sexual abuse. And Michael himself isn't talking, which means that a lot of the detailed narrative as to what's going on in that family might have been unavailable to him. I say might. Might have been unavailable to him. Now, he can go outside those individuals and find out some. Help me understand how much of an extensive and constitutionally adequate investigation would have been, would have revealed to him at that time. Yes, Your Honor. At Excerpt of Records 16 and Subtab Exhibit 133, and specifically there's pages 18 to 226, Investigator Danny Wells, who did the investigation for David Leibowitz, that he went to Kern County to gather records. There's a notation that on October 7th of 1982, he went to Kern County, and he gathered records, and he was able to locate the juvenile records of Michael Alan Hamilton. Now, the reason I cite the court to this particular, these particular pages and this particular tab is that there's a report of a probation officer, and the report is from April of 1967 when Hamilton was 15 years old and was taken out of the home. That specific report, which was apparently obtained by the investigator, Donnie Wells, because his initials DW are on the reports, and also there is a stamp from Kern County. There's a Kern County stamp of October 7th of 1982, noting that Kern County made copies of these records. In the record is the information about the Hamilton home, and it isn't just a fragmentary glimpse. It's not just those tantalizing episodes that some of the case law talks about. There's a coherent narrative that explains that Hamilton was taken out of the home because the father had been molesting Carolyn, had been molesting her since the age of ten, and various acts that the father had performed on Carolyn. That Michael was aware of it, and also it details the abuse in the household. It also details information about the father having made two unsuccessful suicide attempts while in the military. It further goes on to talk about the father's hospitalization. I believe it mentions the mother's hospitalization at Agnew State Hospital, and the cover of that petition talks about the depravity in the household. I mean, it uses that sort of old-fashioned legal language, but it talks about the depravity in the household. Right there, in a nutshell, is not fragments, but a coherent theory of a family which was implicated in what I would describe as a kind of crucible of abuse. What's interesting about that specific report is Hamilton was referred in March of 1967 because of the unfit home. Three weeks later, a probation officer in Kern County, three weeks later, has a whole mitigation analysis laid out. I mean, though it wasn't written for that. That was available to David Leibowitz at the time of the trial. The HOVI, that's the individual sequestered jury voir dire that they used to have in California, the HOVI voir dire began on October 6th. On October 7th, the court talks about psychiatrists being brought in at the penalty phase. On October 8th, Leibowitz himself, in the individual sequestered voir dire, refers to a penalty phase in which psychiatrists might testify. Putting that all together, Your Honor, to answer your question is, that material was available, maybe not to the same degree of elaboration, sophistication, trenchant analysis, and psychiatric spin that it might now have. Would that report by itself have been admissible? Well, that's a good question because there is the People v. Gordon case that says that, in a case where records were not found admissible, but we distinguish that in our briefs as being admissible because the Gordon case involved records that a co-defendant's counsel had obtained from an institution that had obtained them from an orphanage. These are court records with a court certification in them. They're actually shown on the records, certified court records from Kern County, October 7th, 1982, and we believe they would have been admissible as business records under 1271 of the evidence code. Or even if they weren't admissible, they could be given to an expert business. Exactly. To talk about. But I have a different question, having been on this year of the Leinergen panel. I'm interested in knowing to what degree did the lack of cooperation of Mr. Hamilton himself impede counsel from actually being able to appreciate the meaning of those records or understand that there was something to be done? I don't even know really if Wells gave him the records. They were obviously in Wells' files. I don't know if the counsel actually looked at them. But did he, was there, did Mr. Hamilton's refusal to cooperate rise to the level of the Shiro case, or Leinergen case, where that would be a reason for saying that Mr. Leibowitz's performance was reasonable? Well, certainly Hamilton appears from the testimony, and by his own admission at the evidentiary hearing, that he was not fully forthcoming. He did testify at the evidentiary hearing that he provided name, states, places. But he also testified at the evidentiary hearing that he emphasized the guilt phase. And certainly, David Leibowitz has said that they couldn't get information out of him. But Hamilton's alleged lack of cooperation, which the district court did not rely on in its decision, but his alleged lack of cooperation certainly didn't rise anywhere to the level that it did in the Landregan case, which the US Supreme Court reversed this circuit in a 5-4. Landregan was just totally different. I mean, there we had an outspoken, vociferous, contumacious litigant who actively interfered, who, when the attorney tried to put on evidence, and tried to say that something was done in self-defense, he injected in the trial, no, I stabbed the person, it wasn't in self-defense, I committed more robberies. I mean, we had active, palpable interference. If you, an inspection of the record in the Hamilton case does not disclose that. It discloses that at the outset of the penalty phase, Hamilton, a very, well, it's hard to say very politely. I mean, when looking at the cold reading of the transcript. But he asks if he can address the court. Excuse me, your honor, may I address the court? Believe actually says, can I address the court? And then the court takes a recess, and then he addresses the court in chambers, saying that he understands that Leibovitz has an obligation to do what he has to do, but that he, Michael Hamilton, believes that there can't be any mitigation to a crime he didn't commit. But does Hamilton's alleged lack of cooperation rise to any level in which it actively interfered? I would say no, it certainly doesn't rise to Lambergan. And it certainly doesn't rise to the level of the Rompia case, in which the court held that, even though Rompia interfered by not cooperating with the attorney and sending the attorney out on false leads, that still there should be a new penalty phase. So I would say that Hamilton's alleged lack of cooperation here doesn't rise nearly to the level of other cases that have been before the court, the Rompia case, the Douglas v. Woodford case, in which you've had somebody that didn't cooperate. Moreover, the case law and also the ABA standards say that even if the client wants the death penalty or doesn't cooperate, that you still have an obligation to examine all factors of mitigation. So I just, I submit that Hamilton's lack of cooperation, and certainly there's some evidence of that, did not rise to the level of active interference. Woefully, for some reason, I suspect that it was because Mr. Liebowitz was in the middle of the jury voir dire, in the middle of the trial, that he didn't capitalize upon and use that evidence that was available to him. And one of the reasons that, you know, besides being a 1982 trial, that Ayers v. Belmonte's case that we added in the supplemental authorities, I mean, we wanted the court to look at that case not only because it was a 1982 trial, but also because they're, you know, some of the same issues. And the court in that case talks about taking mitigation and securing experts who can explain the mitigation. So I think Liebowitz had to have known about psychiatrists because in the jury voir dire, in the Hobie voir dire, he talks about psychiatrists being used in a penalty phase. And certainly that was not new law in 1982. And as to this specific probation report that was available in Kern County, if the report itself hadn't been admissible on its own, then, as Your Honor suggests, I mean, there could have been somebody, a psychologist, I guess a psychologist comes to mind, as somebody who could have woven through and stitched through the threads of the Hamilton family to have woven this fabric of a nightmarish and, you know, tormented family, that could have at least explained, mitigated the crime in the sense of explaining how Michael Hamilton must have grown up in his formative years as a teenager in a household where women were debased and degraded. And, I mean, I'm not a psychologist, so I can't exactly predict how a psychologist might try to attenuate the crime. But growing up victimized where women are subjugated, derided, beaten, then I guess it can teach a lesson that that life is less valued. But clearly... That is another one of my questions I have. This was a pretty cold-blooded, premeditated, rehearsed murder. And I'm wondering how the available, accepting all this mitigation evidence about the family life was available. And counsel was deficient. How, what is the significance of that family life in relation to explaining why he shouldn't have the death penalty for this cold-blooded, premeditated murder of his wife and baby? Well, certainly the district court tried to compare the Hamilton case by saying that it was premeditated, and therefore the district court tried to distinguish between other cases. But the way I think that could have been, you know, woven into a mitigation theory was to go back to, I'm going to harken back to what I was saying a few moments ago about Hamilton growing up in this cauldron of violence that then taught him violence in those formative, sensitive teenage years. How I wish that Lebowitz had been able to secure the reports of Karwocki and Wilkins when Hamilton was but a boy of 12 and his scores on the MMPI showed that, you know, he was schizophrenic at the time. Of course the crime is brutal, but this court has found in many cases where there are crimes involving torture and we'll think, for example, Silva v. Woodford, where there was the killing of one person, there was the abduction of a couple, there was the killing of one, they were kidnapped, there have been cases of, you know, people being bludgeoned in the head where there's torture, rape and torture. I mean, I think that you, that it's very hard to distinguish between levels of heinous depravity. These death penalty cases, they all involve heinous, you know, horrific, morally repugnant crimes. The fact that this was, you know, premeditated, the court, the district court said something about comparing Silva v. Woodford, that was a crime of opportunity, more opportunity when you see people who are vulnerable and pathetic. I think it could be argued that a shotgun blast that kills somebody instantly, yes, it's horrific, yes, it's depraved, doesn't at least prolong some sort of needless suffering. And then if you add to it the family dynamics of three, you know, three people working together and, you know, two people getting second-degree murder, a proportionality argument, Leibowitz did make that. He did make a proportionality argument, but he made, and he made to some degree an eloquent plea for life, but it wasn't dressed out in the full fabric of the mitigation evidence. I don't know that I can answer your question well, or maybe as well as you'd like, on the issue of premeditation. Yes, the cases it looks involved premeditation. It involved one after another failed attempts, so that does make it morally repugnant. Well, what we have to find is that at least one juror hearing this evidence of this horrific family life would have voted for life instead of death, and that's what I'm looking for. Would one juror? Yes. And the question for that one juror is, under Strickland, more likely than not would have? That's right, and also when you're looking at that one juror, you have to look at whether this lack of evidence undermined confidence in the outcome. So it's a given that it was repugnant premeditated crime, but with this welter of evidence that we now have, and not just looking at the standards of today, but looking at the evidence that would have been available through traditional methods of investigation and was available but apparently was not used, we don't know exactly why. Maybe Liebowitz never saw all that investigation that Donnie Wells did. But one thing that Mr. Wells found when he was interviewing Victoria, his notes say, interviewed Victoria at Fraser Park. She talked about Michael Hamilton's childhood, but then there's nothing in the report about his childhood. So my main points are that the investigation was rudimentary, but such investigation as did exist did gather together the basic outlines of what I think could have been a powerful and compelling mitigation case. It certainly would have required experts to have pulled it to the various fabric and the threads together into a coherent narrative, but that could have made a difference, and the lack of this evidence undermines confidence in the outcome of the trial. You're over your time. Oh, yes. Thank you very much. Good morning, Your Honor. Sarah Stetler on behalf of Petitioner Michael Hamilton. Because we're short on time, first I'd like to open it to the Court to whether you have questions specifically as to the Brady claim or the prosecutorial misconduct claim. Well, I've been trying to sort out whether Gray actually was telling the truth or not when he said that there wasn't anything about bail pending the testimony in the actual plea agreement. Do you know the answer to that question? Well, I think Your Honor points out the reason why this claim should have been subjected to an evidentiary hearing in court, because on the face of the plea agreement, there's no language about sticking to a scripted statement, no language about the bail conditions, but the clear inference from Gray's declaration providing post-conviction investigation is that there were some deals being made in the back rooms because of his ties to law enforcement. He was getting sort of kid-glove treatment from the prosecutor, and part of the agreement was that he would be out on bail after having admitted to participating in a murder. As I understood, the prosecutor was concerned that Gray, that the witness had testified from Kmart, I guess it was, that Gray had been present when she sold the gun. Yeah, and that is an important point because Lillian Bardsley sees Gray in the hall waiting to testify. She immediately reports to both the prosecution and the defense that that's the guy, that's one of the people that I saw. Of the three people that were there for the gun purchase, that's one of them. At that point, the prosecutor says, this goes outside of the statement that was given by Gray. Well, he was concerned that Gray may have had more involvement in the crime. What's that? The prosecutor was concerned that Gray may have had more, his involvement may have been deeper. Yeah, than what he admitted to in his interview with the police, and that's why he delayed Gray's testimony and allowed Gray's brothers, who were a sheriff and a police officer, to round up, as he said, alibi witnesses to dispute what this neutral witness, the Kmart employee, had just said. And none of this was ever previously reported to the police. It was not until he was ID'd by Lillian Bardsley that these family members come forward and say he was with us. So the inference from the, I think, the declaration is that this alibi was fraudulent. Of course, that wasn't admitted to in the declaration. He doesn't say anything about that in the declaration. No, exactly. He doesn't say it, but that is the clear inference. Just like he doesn't admit to being the shooter, but the inference from the declaration is that his vantage point, contrary to what he had told the police earlier, his vantage point was that of the shooter or that of someone standing beside or right behind the shooter, which was different from what he told the police, which was he was in the cab of the other truck. He looked back. When it happened, he looked forward. He didn't see anything. It was a much different, more graphic description in the declaration, and that is why we petitioner believe that an evidentiary hearing should have been held in the district court to sort out these disputed facts. And disputed facts, I mean, I understand some of them are disputed facts. I mean, Garay might not have been telling the truth as to whether or not he was present at the purchase of the gun. He might not have been telling the truth as to whether or not he was the shooter. But basically, we're talking Brady claims.  that it's not handing over in violation of Brady? Well, we have two things. We have the Brady claims, and then we also have the Napui claims that there was procured false testimony, which the prosecutor knew was false. But the district court and the respondent, the warden, both pointed out that Leibovitz knew about his ties, Garay's ties to the law enforcement community, and so the implication, it could be argued, by Leibovitz and was argued that there was some sort of preferential treatment. But the full extent of the law enforcement in rounding up the alibi witnesses, meeting with Garay prior to his giving a statement to the police, none of that was disclosed to the defense counsel.  He could have really had some facts to point out that there's a reason why this person is not admitting and he's getting special treatment. And his theory of the case was that Garay was the shooter. Yeah. Unless Your Honors have any more questions, we'll reserve our time for rebuttal. Thank you. May it please the Court. I'm Catherine Chapman from the Attorney General's Office. I represent the appellee. I'd like to begin with the claim of ineffective assistance of counsel also, and I'd like to begin by talking about the witnesses who actually could have testified about Mr. Hamilton's family history,  Even now, after more than 20 years of searching, Mr. Hamilton cannot identify a single additional witness by name and accompanying declaration who had knowledge of this abuse and could have testified to it. Of all the declarations before the Court, there are six people who know about it. There's Carolyn, Vicki, and Jacqueline. There's Uncle Jack Hamilton, Mr. Hamilton's father's wife, Lillian Cagle, and Mr. Hamilton's former wife, Christine Woods. Which one's Marvin? Marvin is one of Mr. Hamilton's uncles. There's no declaration from him. I believe he was deceased by the time declarations were collected. His interview was discussed extensively in the evidentiary hearing, and Mr. Liebowitz was adamant that there were serious, serious problems with attempting to call Marvin Hamilton as a witness. I understand that he felt that way, and I think the District Court also made a finding on that, but how could Marvin's testimony have hurt Mr. Hamilton any more than his jury conviction for first-degree murder? I mean, at that point, the jury's already convicted him and found certain things that are pretty horrible, and, I mean, the fact that Marvin doesn't like him and Marvin thinks he has no doubt that Mr. Hamilton did it, how does that hurt Hamilton any further? Here's how it would have hurt him further. Marvin would have testified that he spoke with Mr. Hamilton after the murders, that Mr. Hamilton kind of tried to put on an act of being upset. Marvin told him to cut it out, and Mr. Hamilton immediately did so, became calm, and started talking about the insurance money. Now, that would have shown a pretty striking lack of remorse for the crime he had committed, and that in a mitigating, in a penalty phase, I think, would have been very damaging. And the other problem with Marvin Hamilton is that he said to Mr. Liebowitz, don't call me. So there's no indication that Marvin Hamilton, even if called, would have testified. Could he have called, subpoenaed him as a hostile witness? I, frankly, have never seen in a penalty phase a witness called as a hostile witness. I think it's a reasonable... But if the facts are... I don't want to go beyond the record, because we don't have experts talking about that, but typically people don't want to broadcast sexual abuse and acts of the sort that were going on in the Hamilton household. I mean, look at his own mother's testimony, how she was very vague about all that and didn't want to talk about it. So, if you were trying to get out those facts through a witness, and Marvin didn't want to testify, it still could have helped to have him come in and say, yes, these things were going on in that house, I was aware of it. I'm sure he would have denied that he actually participated in some of it himself, but... Mr. Leibowitz had made the decision to bring the evidence out through Jacqueline Hamilton. He had talked to her. He had told her what he was going to be asking. He had reason to think that she would be forthcoming having possession of the probation report of prior cases. I'm not sure that's right, even based on what we hear from Leibowitz, that he had reason to expect that she would come forward. He said a couple of different things about what he expected and didn't expect out of her. He knew she was difficult, but he had talked to her. He believed he could get the evidence out through her enough to get some sympathy from Mr. Hamilton. Could you explain to her why he wanted that, why he would need that information? I'm trying to remember exactly what was said in the evidentiary hearing. I recall him testifying that he did speak with her and tell her what he would be asking. Did he tell her why? Do we know? I don't know that that was specifically testified to in the evidentiary hearing. He did testify at length about explaining to Mr. Hamilton himself the importance of mitigating evidence and why he needed it. I just do not recall that question being asked. Now, your point, which I think is a valid point, is essentially the point that I raised in my initial question to the other side. And the answer, at least a significant part of the answer, was, well, you have this 1967 Kern County report. And I'm sure you heard. What's your response to that? Well, the probation report contained the information, and this may be how Mr. Liebowitz learned about it in the first place. It was either through this probation report and these records, or it was through Marvin Hamilton. But in any event, the probation report is, of course, hearsay within hearsay. I strongly disagree that it would have come in as a business record under California law. A business record is created by the employee of a business or public entity at or near the time of the act, condition, or event. Now, if it doesn't come in as a business record, I'll assume for purposes of my question that that's right. It seems to me that it could have come in, I'm now using it in a slightly lay sense, either through an expert or if it turns out, as it did turn out during the examination of Jacqueline Piper, the mother, that she doesn't remember, well, you don't have to have it admitted. All you've got to do is read from it and say, I'm reading the following. This is a such-and-such report. I'm reading the following. Treat her as a hostile witness and use it as an effect of cross-examination. If it comes in that way, the jury hears every word of it. Now, if it doesn't come in as a document that shows up in the jury room, I understand that. A couple of things. I think that Mr. Lee was, again, and made the decision to bring out the evidence through Jacqueline. But, of course, then she's unwilling. Was surprised, he testified, by her total unwillingness to talk about the abuse at all. Did not anticipate having to impeach his own penalty phase witness. The probation reports provide some detail. They, in no way, provide the kind of detail that Mr. Hamilton argues could have, should have, been presented in this case. So, and it's, you know, it's a report. It's not the testimony of a witness. It's not compelling in the way that the testimony of a witness is. Was that report used by the Superior Court in a proceeding? Was it used? I presume so. So you don't think the information in it was generally reliable? You know, it may have been reliable to some degree, given the outcome of those cases. But, again, you know, I don't know that it would have overcome the evidence code. I don't know. We don't know. What about Carolyn and Gray? Now, they had already entered their plea agreements, correct? At the time of trial? Right. My understanding, yes. They testified that they had entered their plea agreements. Yes, they specifically had pled guilty but not yet been sentenced. So why couldn't he call, I've seen this a couple times in the record, that he couldn't call them because they were adverse and they were represented by counsel. I don't see why he still couldn't have called them as hostile witnesses to get the facts of, not Gray, but Carolyn, certainly, the facts of his family life that would have served as a basis to maybe help someone understand how he could commit such a cold-blooded killing of his own wife. I mean, I don't think that argument that's being made, or I think the district court even relied on it, that they were adverse witnesses represented by counsel so they couldn't be called. I don't think that's correct. You know, if we look at Carolyn's declaration that's been submitted to this court, near the end of her declaration she says a couple of things I think are very interesting. And one is that at the time of trial she was convinced that her brother was a terrible person and no place in her declaration does she say that she would have talked to Mr. Leibovitz. And this is a problem with many, many of these declarations. The witnesses don't say, I would have talked to Mr. Leibovitz. None of them say I would have testified at trial. I'm saying, subpoena them. Call them as hostile witnesses. The jury already knows he's a horrible person, so what if Carolyn says it too? I'm saying we already know that when we cross that bridge. All I can say is that Mr. Leibovitz, for a number of reasons, made the decision that Mr. Hamilton's mother was the best avenue, and he still believes the best and only avenue to get this evidence out. Well, he was wrong about that. That's hindsight. You know, that's hindsight. I'm not sure it's very much hindsight. He knew that she was on the stand. And if he'd had any sense of sort of anticipation or variation on these things he knew that she was a difficult person. He knew that she was kind of back and forth. This is what he says as he's kind of defending his own performance. He knows that sometimes she'd cooperate and then she'd kind of go off and wouldn't do anything. He knew that there was this potential for her not being at all helpful on the stand. And then it turns out she's not. However, Vicki and Carolyn had much more potential for not being helpful on the stand. They were most definitely looking after their own necks and very adverse to Mr. Hamilton at that time. I think he made a reasonable choice. I think that he can't be held responsible for her lack of cooperation on the stand. What would have been the best option, I think, would have been for Mr. Hamilton to testify as to what happened to him as a child. I mean, particularly if you look at these articles that were submitted as further excerpts of record. These are 1979-1982 articles. They talk eloquently about how important it is for the defendant to take the stand himself and tell the jury who he is, how he came to be in this situation. That's what would have worked. But Mr. Hamilton wasn't going to do that. I would like to address the idea of using experts in this case. Mr. Hamilton's attorney talks about if only experts had been gotten to synthesize this evidence, to present this evidence. But we don't have to guess how that would have gone because we have declarations from a psychiatrist, Mr. Woods, in the record. And Mr. Woods had the benefit of all the information that Mr. Hamilton says should have been found, should have been presented. Note he doesn't arrive at a diagnosis. His declaration is couched in the vaguest possible terms. He mentions unspecified mental and emotional impairments. There are no test results. He never ties it up in the way that Mr. Hamilton now says should have happened. The abuse and the very calculated crime that took place. He also makes a couple of findings. For example, he describes Mr. Hamilton as being very vulnerable and easily led, which is completely contradictory to the evidence that the jury had just seen. He says that Mr. Hamilton was unable to appreciate the nature of his acts. Again, completely contrary to the evidence the jury had seen in the guilt phase in which Mr. Hamilton had very carefully covered his tracks, showing a complete consciousness of guilt and wrongful conduct by having others do much of the dirty work and provide alibis. So I don't think that we have to guess as to what some expert would have done. This is the most an expert would have done. And it's not compelling. Similarly with the social historian, which, as the court knows, I have argued at length was not done in 1981, 1982. Mr. Leibowitz so testified. Mr. Hamilton's own expert so testified. Everything that I've seen indicates that that was not common at that particular time. But the social historian with the benefit of evidence that was not available to Mr. Leibowitz at the time simply states that studies confirm that the impact of such environmental influences can affect a person. But that doesn't again tie it up with what Mr. Hamilton did. So when you say tie it up, I think that what's the argument? Maybe it's a question for a psychiatrist, but what's the argument that all the horrific things that occurred in Mr. Hamilton's family life and being sent to foster homes and I guess I gather he was diagnosed with schizophrenia at one point and suicidal at another. How does that relate to this crime that he committed? I don't recall a diagnosis of schizophrenia or suicidal. I believe those reports don't mention suicide. They do recommend further treatment and symptoms consistent with You're not really answering my question. I'm sorry. Your question is how does it mitigate? What's the argument that would lead us to say or not to say that it's more likely than not that one juror would have gone for life instead of death? The evidence is at most humanizing. It has the potential for creating sympathy. But this case I mean this is a case in which Mr. Hamilton decided a month in advance to murder his wife, knew she was seven months pregnant, did it for money and to be with his girlfriend deliberately deprived his four living children of their mother intended to use them as alibi witnesses. The long term planning and organization is unlike almost any other case I've ever seen. He used all his nearest and dearest, some of them knowing it, some of them not to further his plan. He used his sisters as accomplices his children as alibi witnesses his mother to stage the discovery his girlfriend to buy the gun three attempts in a row You know I would say this is like Allen in that sense in the calculation sense except that the quality and nature of Allen's humanizing evidence was really negligible. As I recall the humanizing evidence in Allen was positive attributes witnesses who could have said positive things about Allen mostly but it's similar in nature in that the effect of it the effect of that type of mitigating evidence is not explanatory, it's not tied to the crime, it's tied to the person. Does it have to be tied to the crime? It doesn't have to be to be relevant, but as mitigating evidence it's certainly more effective if it can explain to the jury this is how he came to be the kind of person who commits this kind of crime and that's what Allen I think even the evidence and I take your point as to what we now know, not all of it would have been available at the time, even after a diligent investigation I'm not quite sure where the line is as to what would or would not have been, but quite a bit would have been I would go to, well here's a boy who grew up in a horribly dysfunctional family in which his sister is repeatedly engaging in sexual incourse with the father, with the assistance of the mother and we have the pattern elsewhere in the closely related families, that evidence I don't see any reason why that couldn't have been found and brought in and to then say but this has nothing to do to explain why he could have been so callous toward his own wife well you or I might not have decided that that was enough, but it certainly is connected as an explanation as to how he got this way, whether it's an excuse that would give him a way out of the death penalty is another question, but it helps explain how he got that way I must respectfully disagree given the evidence that was actually available which in my view is actually very little and doesn't contain the type of detail let's get down to brass tacks do you think it was unavailable evidence and could never have been introduced to the jury that his father had engaged in incest with his sister it the Jacqueline Hamilton did testify that there was abuse that's a different question was the evidence we know now that the father engaged repeatedly in incestuous behavior with Caroline would reasonable investigation by Leibowitz not have turned up admissible evidence that that had been so I don't see any in this record I see no admissible available evidence in this record are there no records that show the disposition of the father why the father was put away there's got to be records that say that's why this happened that he pleaded guilty to incest and was committed to a Tascadero that's a little bit more that was exactly the piece of evidence I asked was there no evidence there was evidence there was that in court records and was there evidence that the mother was also convicted in prison because of her assistance right she went to jail so we would know that too at trial but Mr. Leibowitz did plan to introduce that evidence plan to introduce it through petitioner's mother Mr. Hamilton's mother for any number of perfectly good valid reasons but he never did because she didn't cooperate well actually she did say that Michael's father was put in prison in a state hospital but he never the other part that I find so deficient really lacking let's say it was reasonable to go with Jacqueline she herself was convicted of a crime of aiding and abetting this there was a crime record of a conviction against her which he could have used contributing to the delinquency of a minor well right well what was that about I mean why he didn't even ask her that when he saw her you know when he was so surprised that she was difficult in not answering his questions why didn't he whip out the record of her own conviction  you know at some point I think you have to respect your client's wishes so wait a minute is there anything in the record that says that Hamilton told Lebowitz not to ask his mother about her prior conviction based on her allowing her husband and participating with her husband having incestuous relationships with the two girls he didn't want her on the stand at all he didn't want Mr. Lebowitz to talk to her he didn't want her on the stand so once he puts her on the stand um she's there what's the rationale how could it be reasonable when she's there and she's surprising him because she's not saying what she was supposed to be saying of just getting it out a man's life is at stake what does it mean to say okay you're not going to cooperate with me here bring out the record I think that Mr. Lebowitz thought a couple of things about um about Jacqueline he thought that just having her there just having her on the stand so the jury could see what she was like would have some value in creating sympathy and I think he accomplished that I think he was not prepared to or intend to I don't think he accomplished that at all she testifies as to whether he had a relationship with his father I'm not going to get it verbatim but she testifies well he could have but he chose not to I mean we leave that sort of sitting there okay this was his choice he decided he didn't want to be with his father I mean the testimony that she gives and as we know it's just a few pages I view that as on balance entirely unhelpful it was hurtful bearing in mind though that she also testified at the guilt phase that's right she was hostile both at the guilt phase and it turns out at the penalty phase I think the jury picked up on that I think they had to say this is his mother this is who raised him yeah but I don't think that works to his advantage well I think that it does I think that it does because they could see that this was not a woman who was demonstrating a lot of caring yeah but the jury doesn't know for example that she assisted in the incest with her own daughter the jury just sees this mom who okay as far as I can tell as I read this testimony what the jury has is here's a mother who has a despicable son she's lost sympathy with him and she's not going to help him out the only only way I see that he could possibly have gotten that evidence in would be to impeach her with those court records and those court records are just court records did he have the court records at the time I am pretty sure that he did you may recall that the the file was incomplete but somehow a lot of Mr. Liebowitz's records went missing while they were in the possession of Mr. Hamilton's various attorneys so there was little to reflect his recollection about a lot of things these records turned up after the first evidentiary hearing they appear to be the records that Mr. Wells had previously testified he obtained from county offices and as I said they may have been the source of Mr. Liebowitz's knowledge that about the abuse which he did not get from Mr. Hamilton so I believe that he had them I believe that as he repeatedly testified that he truly believed that Jacqueline Hamilton was his only avenue to get the evidence out and that he did not anticipate having to impeach his own penalty phase witnesses but you know his what he left the jury with was even his own mother doesn't care whether he gets a death penalty that's how it was well it was but there was so much more there to explain who she was and how she would come to have that kind of attitude or had that attitude to her children even when they were small that if that had gone before the jury too you could have turned that and made it this is the environment in which he was raised and this started this didn't just start with after he murdered his wife it was from the time he was a young child the problem as I see it is assuming that Mr. Liebowitz should have gotten those records into evidence they do not contain the type of detail that Mr. Hamilton is pointing this court to now they are only reports they taking that additional evidence in addition to what Jacqueline testified to and putting it up against the tremendously aggravating circumstances of this crime I don't see any possible way that that would have turned even one juror in favor of a life without possibility of parole sentence I just see no way the crime is too aggravated they heard all about this plan they saw autopsy pictures of crime scene photos of the dead pregnant woman, they saw autopsy photos of the fetus that looked like a baby it just was never going to work does the court have any further questions on the ineffective assistance plan there's one thing I would like to clear up about the Brady claim Mr. Hamilton asserts now that the prosecution actually delayed Mr. Garay's testimony the record does not support that Mr. Garay testified the day after Mrs. Barsley testified in a logical order Mrs. Barsley testified on November 1st that's the day that she says she spotted Sharon and Mr. Garay in the hall there was Carolyn's testimony to come after that and that took the rest of the day and into the next day and then Mr. Garay testified there's no indication that wasn't the expected order of his testimony does the court have any questions on the Brady claim I think that there really is no possible factual dispute as to the issue of bail this court is in receipt of the plea hearing for Mr. Garay in which the agreement is described on the record and the agreement is limited to full and complete testimony at Mr. Hamilton's trial the bail issue was put over to a further proceeding did the plea agreement itself just describe disappear was there a written plea agreement we have through extensive searches on both sides not been able to find the written plea agreement but it is set out fairly clearly in the reporter's transcript and the reporter's transcript does indicate that there would be a further hearing on bail it reflects Mr. Garay's counsel's understanding that the prosecution was opposed to bail I think it's a red herring if the court has no further questions we would just respectfully ask that the district court's findings be affirmed thank you your honor just a few points with respect to the IAC claim whenever we deal with the death penalty case by their very nature the facts of the crime are going to be horrible and that's often a part of the argument that's raised by the state but this court has found in many cases where the facts have been much worse Mack v. Blodgett involved 13 deaths execution style in a gambling club Hendrix there were two murders in LA, two in SF cases overturned by the Supreme Court, Wiggins 77 year old woman drowned in her bathtub sprayed with pesticides after killing and then a Terry Williams, the victim was hacked to death in bed Simmons, hog tied victim tossed off railroad trestles granted all of these cases are horrible that's not what a case of mitigation is tied to no case has ever found that if the facts are so bad no case in mitigation will overcome them it's just not the case in fact in all those cases it was found that in post conviction when the facts in mitigation were developed the courts were persuaded that it could have had just that very effect on a single juror had it been presented at trial as far as the experts there are the occasional case but I think they're distinguishable I think the case the facts that we have here while awful are certainly not the worst of the worst you also have cases that have settled for less than well a recent example the Brian Nichols case in Atlanta the Atlanta courthouse shooting where a judge, a court reporter a U.S. Marshal there were a number of violent acts that all occurred while he was trying to escape let me ask you this because I think we understand that point what in your view was the evidence that should have been discovered could have been discovered by Mr. Leibowitz and that would have been introducible at trial including by a cross-examination I think the court has already honed in on it the horrible facts of the childhood of Mr. Hamilton and his sisters was right there there's some dispute of whether or not the records were actually in trial counsel's file certainly discoverable even if they had not been public records are very easy to find they should have been discovered they should have prompted further investigation and as the court noted experts could have testified to this the investigators from the probation department there are numerous witnesses that could have been brought to bear in court to bring these facts to light I believe that these facts would have turned most likely more than one juror to come back with life I also wanted to point out that there was a suicide attempt by Mr. Hamilton while he was in jail which would prompt any reasonable attorney to get an expert in there post haste to do an evaluation I mean it's given the father's history of suicide suicidality this suicide attempt even without the history should have prompted an expert to get in there as far as the nexus of the facts of the crime and the mitigation the U.S. Supreme Court has repeatedly found that there is no nexus necessary Tenard v. Drecke was the most recent case where often times there's not going to be an explanation through the mitigation for why this crime occurred it's just to humanize the client to give the juror some understanding of why they may have ended up the way they did Did you address our recent pin holster case? It's somewhat similar the only witness that was put on was the mother in mitigation. Are you familiar with that case? I'm familiar with it but I've read so many cases over the past few weeks if you could jog my memory a bit Well, I'm just a little concerned. That case we found no ineffective assistance at the penalty phase when the the defense counsel did not investigate a number of things having to do with mental impairment and humanizing elements and solely put on the defendant's mother as a witness similar to this situation and we found no prejudice And the court's finding of no prejudice was based upon the lack It basically just disregarded said none of this would have had any impact on the jury. It wouldn't have caused one juror to change their mind. And was it because of the facts of the crime were considered? No, not really It's a new case It's a fairly recent case. We'd be happy to provide any supplemental briefing that the court would ask if necessary because to be honest I can't remember exactly Your co-counsel mentioned a case in June but this case was in May so I don't know if she was mentioning the same I know that it was I'm sure it was in the pile of cases that were reviewed but I don't have it at my fingertips right now Thank you Alright, thank you Thank both counsel for excellent argument and this session of the court is adjourned for today
judges: Wardlaw, Fletcher, Paez